# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BRYAN DAHL, MAUREEN YOUNG, KAREN NEEDHAM, and RACHEL MULLINS, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JPMORGAN CHASE BANK N.A.;**<br><br>**Defendant.** | **Civil Action No. _____**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 2

THE PARTIES................................................................................................................. 8

    A.    Defendant................................................................................................ 8

    B.    Plaintiffs ................................................................................................. 8

FACTUAL ALLEGATIONS ....................................................................................... 11

    A.    Overview of the Payment Card Foreign Exchange Market ................... 11

    B.    Applicable Contractual Provisions ....................................................... 14

        1.    Chase's Agreements with Class Members................................. 15

        2.    Chase's Agreements with Visa and Mastercard. ...................... 17

    C.    Chase Charged Unlawful Foreign Exchange Rates in Violation of its Contract .. 19

CLASS ACTION ALLEGATIONS .............................................................................. 22

CLAIMS FOR RELIEF ............................................................................................... 25

PRAYER FOR RELIEF ............................................................................................... 32

DEMAND FOR JURY TRIAL .................................................................................... 33

Plaintiffs Bryan Dahl, Maureen Young, Karen Needham, and Rachel Mullins (collectively, "Plaintiffs"), allege the following claims for relief against Defendant JPMorgan Chase Bank NA ("Chase" or "Defendant").

## INTRODUCTION

1.     Defendant Chase is a nationally chartered banking association that offers deposit accounts, investment and financial services, mortgage and non-mortgage loans facilities, and credit cards issued to consumer and business clients. Chase issues primarily Visa-branded credit cards, but also offers several Mastercard products.

2.     Visa Inc., Visa U.S.A. Inc., and Visa International Service Association (collectively "Visa") are together a U.S.-based multinational financial services corporation that processes electronic funds transfers throughout the world through their electronic payments network (known as "VisaNet"), most commonly through Visa-branded credit cards, debit cards, and prepaid cards (collectively, "payment cards").

3.     Mastercard Incorporated and Mastercard International Incorporated (collectively "Mastercard") are together a U.S.-based multinational financial services corporation that processes electronic funds transfers throughout the world through their electronic payments network through Mastercard-branded payment cards.

4.     Plaintiffs and members of the proposed Classes[1] are Chase payment card cardholders in the U.S. who were issued Chase Visa-branded and/or Mastercard-branded payment cards, and used those cards to transact in foreign currencies.

5.     Visa and Mastercard (collectively, the "Processors") do not issue payment cards directly to consumers. Instead, they provide financial institutions—including Defendant Chase—

---

[1] The Nationwide Class and proposed state subclasses are referred to herein as the "Classes."

with Visa and Mastercard-branded payment products that the financial institutions then offer as payment cards to their customers.

6.    Visa and Mastercard require the banks that issue Visa and Mastercard-branded payment cards (the "member banks") to agree to be bound by certain rules of Visa and Mastercard. These rules provide, *inter alia*, that the foreign exchange ("FX") rates applied to consumer payment card transactions in foreign currencies for each day will either be wholesale FX market rates or a government-mandated rate. The vast majority of jurisdictions do not have government-mandated rates.[2]

7.    The Visa and Mastercard rules also provide that the member banks must provide specific disclosures to cardholders describing what FX rates will be imposed.

8.    Chase requires all of its cardholders, including all Plaintiffs and members of the proposed Classes, to agree to the terms of standardized credit card agreements ("Cardholder Agreements") as a condition of being issued a Chase credit card.

9.    Chase includes language referencing the Visa and Mastercard rules in the Cardholder Agreements, promising cardholders, including Plaintiffs and Class Members, that the FX rates applied to foreign transactions will be either wholesale market rates or, in jurisdictions that have them, government-mandated rates.

---

[2]  Some countries use fixed exchange rate systems, sometimes called a pegged exchange rate, in which their respective currency's value is fixed or pegged by a monetary authority against the value of another currency, such as the U.S. Dollar. For example, the Bermudian dollar is pegged to the U.S. Dollar at a one-to-one ratio by the Bermuda Monetary Authority. Visa does not apply government-mandated exchange rates for foreign payment card transactions in the limited set of countries that have adopted fixed exchange rate systems; instead, adjusting the rates to provide a profit for itself. For all other currencies, Chase's Cardholder Agreements all provide that wholesale FX market rates must be applied.

10.     Contrary to the Cardholder Agreements between Chase and Plaintiffs and members of the proposed Classes, the FX rates applied to cardholder transactions do not represent rates available in the wholesale FX market.

11.     Further, even when the FX rates imposed by Visa and Mastercard are within the trading ranges of the individual currencies within the wholesale market for the applicable dates, the methods by which the rates are imposed are unfair, in bad faith, and therefore in violation of the Cardholder Agreements.

12.     Based on the language of their Credit Card Agreements, cardholders reasonably expect (and are led to believe) that the member banks are charging wholesale rates that bear some resemblance to the rates that the Processors and the banks themselves receive because the Processors and banks are themselves transacting in foreign currencies to facilitate the cardholders' transactions. In fact, however, the banks and Processors rarely engage in wholesale market transactions to facilitate the cardholders' transactions. The Processors settle many of the so called "foreign" transactions by U.S. cardholders with foreign merchants in U.S. Dollars, meaning neither the banks nor Processors engage in any currency conversion at all. In these instances, the need for any currency conversion is a pure fiction, and any hidden charge for the same, and/or the manipulation of FX rates in breach of the Credit Card Agreements, is unlawful. While the price the U.S. cardholder was quoted was in a foreign currency at the point of sale, the cardholder's account was in fact debited in U.S. Dollars, and the foreign merchant was paid in currency U.S. Dollars, meaning there was no foreign currency involved in the transaction at all.

13.     Even in transactions that Processors actually settle in foreign currencies, the need for currency exchange is minimal. The Processors are engaged in multilateral global transactions on a massive scale (*i.e.*, doing multiple transactions in both directions—*e.g.*, U.S. Dollars to Euros,

and Euros to U.S. Dollars). As a result of all these transactions, the Processors are constantly in possession of large amounts of various currencies. Given their own currency balances, the Processors only need to engage in foreign currency transactions to settle any *net* currency settlement requirements.

14.     In sum, the FX rates that the Processors impose and that member banks, including Chase, charge cardholders for foreign transactions are largely a fiction and represent a non-transparent charge. They bear no resemblance to any exchange rate obtained or which could be obtained by the banks or the Processors in wholesale markets, as many times the Processors exchanged no currency whatsoever (because the transaction was settled in U.S. Dollars or because the Processors had foreign currency on hand to settle the transaction with the foreign merchant) or traded at spot or forward FX prices.

15.     Instead of approximating the banks' and the Processors' actual costs of acquiring foreign currency to settle transactions, the rates the Processors impose and banks, including Chase, charge consumers for FX transactions are designed to maximize profits for the banks and the Processors. Specifically, the rates imposed vary based on the direction of the transaction, and nearly always favor the banks and Processors. For example, for any given processing date, the rate imposed for converting U.S. Dollars to Euros will be significantly different from the inverse rate for converting Euros to U.S. Dollars. In both instances, it will be outside—or at the very high end of—the daily ranges of wholesale market rates for each currency conversion. This means that the cardholder will always get the worst rate and the Processors will always get the best rate.

16.     Wholesale FX market participants make offers to purchase foreign currencies (referred to as a "bid" price), sell FX (the "ask price"), and the difference between the bid and the

ask is called the "bid-ask spread." Because the trading volume is so large, bid-ask spreads in the wholesale FX market are generally exceedingly small.

17.     Despite the fact that wholesale market rates are expressed as a bid-ask at a given point in time, the rates imposed by the Processors are not contemporaneous (*i.e.*, from a bid-ask at a given point in time on the wholesale market). Instead, the spread between the two rates imposed by the Processors for each currency pair (e.g., the spread between the rates for Euro to U.S. Dollar and U.S. Dollar to Euro) exceeds the normal bid-ask spread by considerable margins, much greater than those at any given point in time on the markets themselves. In other words, the Processors and banks create a fictional bid-ask spread (the highest rate in the day versus the lowest rate in the day), and then manipulate the rate applied to Class Member transactions so that the members of the proposed Classes either always get the worst possible rate in either direction, or in fact are applied rates that are even outside of this fictional bid-ask spread, making it even worse for these consumers. This practice renders the promise of a rate from the wholesale markets illusory, as the Processors are acting in a way no party to the contract would have reasonably expected—not to impose a bid-ask from the markets at any given point in time, but to impose a bid from one point in time, and an ask from an entirely different point in time—and then applying the worst possible rate for the cardholder in every case in both directions.

18.     This means that the FX rates imposed are excessively costly for cardholders and unreasonably profitable for the banks, including Chase, and the Processors.

19.     The imposition of high exchange rates operates to the member banks' benefit because it inflates the overall value of the transaction. This leads to a larger credit card balance which translates to higher interest payments on card balances. For transactions where the cardholder is also obligated to pay a percentage of the transaction as a foreign transaction fee,

inflating the total transaction amount also translates into a higher fee for the bank on a percentage basis. The Processors make money on the difference between the rate they impose on consumers to engage in the foreign transaction, and the rate (if any) the Processors actually pay to acquire the foreign currency used to settle the transaction. When transactions are settled in the consumer's home currency (where no foreign currency is used at all), the Processors' hidden manipulation of the FX rates charged to cardholders enables them to profit at the expense of cardholders. Because the Processors also receive a percentage of the value of each transaction as a processing fee, they also benefit directly from inflated transaction amounts.

20.    Members of the proposed Classes transacted millions of dollars in foreign currencies with their Visa and Mastercard-branded Chase credit cards during the relevant time period. Chase's illegal conduct has caused Plaintiffs and the Class Members to pay more for foreign transactions than they would have paid if Defendant had complied in good faith with its contractual obligations to charge wholesale FX market rates rather than contrived rates. Class Members paid more because the FX rates were less favorable than those promised in the Cardholder Agreements (thereby diminishing Class Members' purchasing power) and also because Chase's conduct inflated the amount involved in each transaction, thereby causing Class Members to pay higher foreign transaction fees, which are usually a percentage of the total transaction amount, and to pay more in credit card interest than they would have had to pay had the transaction value had not been improperly inflated.

## **JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

21.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), in that this is a class action in which the aggregate amount in controversy exceeds the sum of $5,000,000,

exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from Defendant.

22.     The Court has personal jurisdiction over Defendant because Defendant's unlawful acts took place, in substantial part, in New York. Defendant has continuously and systematically transacted FX in this District and throughout the United States. Defendant is headquartered in, maintains its principal place of business in, and maintains offices in New York. .

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Defendant resides, transact business, is found, and has agents in this District. Additionally, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

### A.     Defendant

24.     Defendant JPMorgan Chase Bank, N.A. is a federally chartered national banking association, incorporated in Delaware, and with its principal place of business in New York, New York. JPMorgan Chase Bank, N.A. is referred to herein as "Chase." Chase issues both Visa-branded and Mastercard-branded credit cards.

### B.     Plaintiffs

25.     Plaintiff Bryan Dahl is an individual and a resident of Victorville, California. He was formerly a resident of Illinois and lived in Illinois when the relevant transactions were made. During the relevant time period, Mr. Dahl engaged in payment card transactions in Euros ("EUR") with his Chase issued Visa-branded credit card. In violation of Chase's promises in its Cardholder Agreement with Mr. Dahl, Chase charged Mr. Dahl rates that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale

rates (for other transactions) for U.S. Dollar to Euro ("USD/EUR") exchange rates. Chase charged these rates not in good faith, but in an effort to maximize Chase's profits at Mr. Dahl's expense, in violation of Chase's obligations and Mr. Dahl's reasonable expectations that Chase would act in good faith and treat him fairly. The FX rates that Chase charged Mr. Dahl were more costly to Mr. Dahl than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Cardholder Agreement Chase imposed on Mr. Dahl. Mr. Dahl is referred to herein as the "Illinois Plaintiff."

26.    Plaintiff Maureen Young is an individual and a resident of Maineville, Ohio. During the relevant time period, Ms. Young engaged in payment card transactions in Euros ("EUR"), British Pounds ("GPB"), and Canadian dollars ("CAD") with her Chase issued Visa-branded credit card. In violation of Chase's promises in its Cardholder Agreement with Ms. Young, Chase charged Ms. Young rates that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("USD/EUR") exchange rates, U.S. Dollar to British Pounds ("USD/GBP") exchange rates, and U.S. Dollar to Canadian dollar exchange rates ("USD/CAD"). Chase charged these rates not in good faith, but in an effort to maximize Chase's profits at Ms. Young's expense, in violation of Chase's obligations and Ms. Young's reasonable expectations that Chase would act in good faith and treat her fairly. The FX rates that Chase charged Ms. Young were more costly to Ms. Young than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Cardholder Agreement Chase imposed on Ms. Young. Ms. Young is referred to herein as the "Ohio Plaintiff."

27.    Plaintiff Karen Needham is an individual and a resident of Eugene, Oregon. Ms. Needham engaged in payment card transactions in Euros ("EUR") and British Pounds ("GPB")

with her Chase issued Visa-branded credit card. In violation of Chase's promises in its Cardholder Agreement with Ms. Needham, Chase charged Ms. Needham rates that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("USD/EUR") exchange rates and U.S. Dollar to British Pounds ("USD/GBP") exchange rates. Chase charged these rates not in good faith, but in an effort to maximize Chase's profits at Ms. Needham's expense, in violation of Chase's obligations and Ms. Needham's reasonable expectations that Chase would act in good faith and treat her fairly. The FX rates that Chase charged Ms. Needham were more costly to Ms. Needham than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Cardholder Agreement Chase imposed on Ms. Needham. Ms. Needham is referred to herein as the "Oregon Plaintiff."

28.     Plaintiff Rachel Mullins is an individual and a resident of Los Angeles, California. Ms. Mullins engaged in payment card transactions in Euros ("EUR"), Indian Rupees ("INR"), and United Arab Emirates Dirham ("AED") with her Chase issued Visa-branded credit card. In violation of Chase's promises in its Cardholder Agreement with Ms. Mullins, Chase charged Ms. Mullins rates that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("USD/EUR") exchange rates, U.S. Dollar to Indian Rupee ("USD/INR") exchange rates, and U.S. Dollar to United Arab Emirates Dirham exchange rates ("USD/AED"). Chase charged these rates not in good faith, but in an effort to maximize Chase's profits at Ms. Mullins' expense, in violation of Chase's obligations and Ms. Mullins' reasonable expectations that Chase would act in good faith and treat her fairly. The FX rates that Chase charged Ms. Mullins were more costly to Ms. Mullins than they would have been if the rates had been imposed reasonably from within

the wholesale market rate range pursuant to the Cardholder Agreement Chase imposed on Ms. Mullins. Ms. Mullins is referred to herein as the "California Plaintiff."

## FACTUAL ALLEGATIONS

### A.    Overview of the Payment Card Foreign Exchange Market

29.    When a U.S. consumer makes a payment card transaction in U.S. Dollars with a U.S. merchant, the merchant runs the physical card (or card information, for an online or phone order) through its payment card terminal, the card information is submitted to the Processor's electronics payment system, and the system sends information about the transaction to the cardholder's issuing bank to make sure the cardholder has enough money or credit available to complete the purchase, and to confirm that the card is valid and not lost, stolen, fake or expired. The transaction is then approved or declined. For approved transactions, the merchant's account is credited in U.S. Dollars (minus an "interchange fee" paid by the merchant to the bank that issued the consumer's card) and the consumer's account is debited for the full amount of the transaction in U.S. Dollars. Visa and Mastercard set default interchange fees on payment card transactions that merchants are required to pay to the issuing banks.

30.    When a U.S. consumer makes a payment card transaction denominated in a foreign currency with an overseas merchant, the consumer's payment card account is debited for the transaction in U.S. Dollars, and the merchant is credited for the transaction in either its home currency or some other agreed-upon currency, such as U.S. Dollars (minus the interchange fee). Regardless of the currency in which the transaction is actually settled, the Processor performs a calculation whereby the amount the consumer pays is determined as if the transaction had been settled in a foreign currency. The exchange rate used for this purpose is determined by the Processor.

31.    The exchange rate used by the Processor to convert foreign currencies is applied on the "processing date" of each foreign payment card transaction. The processing date for a payment card transaction is the date on which the issuing bank submits the transaction information to the Processor and the Processor accepts that information.

32.    For many credit card foreign transactions, the issuing bank charges a "foreign exchange fee," calculated as a percentage of the total transaction amount. Chase's credit card Cardholder Agreements advertise foreign transaction fees ranging from 0% (*i.e.*, no foreign transaction fee) to 5%.

33.    Credit card contracts between consumers and issuing banks, like Chase, provide that conversion rates for foreign transactions will be determined by the Processor pursuant to the Processor's operating procedures. Visa's and Mastercard's operating procedures for currency conversions are set forth in their respective guidelines. Chase's consumer contracts and the Processors' guidelines are detailed below.

34.    Among the largest participants in the wholesale FX market are dealer banks such as Deutsche Bank, Citigroup, Barclays, UBS, and HSBC. JPMorgan Chase & Co—the parent company of Defendant JPMorgan Chase Bank, N.A., that operates Chase's investment banking businesses—is also a dealer bank and a major participant in the wholesale FX market. Dealer banks trade foreign currency with each other and with other large financial institutions including Visa and Mastercard. Wholesale FX market rates are streamed to dealer banks in real time on major multi-bank FX trading platforms including Reuters and Bloomberg. Wholesale FX market participants use these platforms to make offers to purchase foreign currencies and analyze historical wholesale FX market prices.

35.     Visa and Mastercard also engage in foreign currency transactions with dealer banks. The Processors engage in such transactions to mitigate the risk associated with foreign currency exchange rate fluctuations,[3] and to obtain currencies necessary to cover their cardholders' foreign currency payment card transactions.

36.     However, the Processors do not engage in parallel foreign currency transactions on the wholesale FX market for individual cardholder transactions, either on a per-transaction basis, or even on a daily basis.

37.     Instead, the Processors maintain derivative contracts and reserves of currency and move funds between reserves as needed.[4]

38.     As one court found, the Processors also incur "minimal currency conversion costs." *Schwartz v. Visa Int'l Corp.*, No. 822404-4, 2003 WL 1870370, at *28 (Cal. Super. Ct. Apr. 7, 2003).

39.     Because the Processors generally settle foreign transactions in both directions for a given currency pair (*e.g.*, Visa has U.S. cardholders making purchases both in Europe and European cardholders making purchases in the U.S.), the Processors are only required to "settle" the net amount of each given currency for each day. In other words, if a hypothetical Processor

---

[3] *See infra* n.11.

[4] "The Company uses foreign exchange forward derivative contracts to reduce its exposure to foreign currency rate changes on forecasted non-functional [i.e. non-U.S. dollar] currency denominated operational cash flows." *See* Visa Inc., 2017 Form 10-K, *available at* http://d18rn0p25nwr6d.cloudfront.net/CIK-0001403161/cd6545c2-6c6e-4ba1-8dcd-52cd1521df3a.pdf, at 66 (last accessed June 30, 2021); *see also id*. at 50 ("Risks from foreign currency exchange rate fluctuations are primarily related to adverse changes in the functional currency value of revenues generated from foreign currency-denominated transactions and adverse changes in the functional currency value of payments in foreign currencies. We manage these risks by entering into foreign currency forward contracts that hedge exposures of the variability in the functional currency equivalent of anticipated non-functional currency denominated cash flows. Our foreign currency exchange rate risk management program reduces, but does not entirely eliminate, the impact of foreign currency exchange rate movements.").

processed $1 billion in transactions from Euros to U.S. Dollars and the same amount from U.S. Dollars to Euros on a particular day, the Processor would not need to engage in any actual FX transactions in the wholesale market on that day.

40.    Moreover, in many instances where U.S. consumers are quoted a price in a foreign currency (i.e., Euros), the Processors settle the transactions with the foreign merchant using U.S. Dollars. In these instances, no foreign currency whatsoever is required. The U.S. consumer's account is debited in U.S. Dollars, and the merchant is paid in U.S. Dollars. The Processors have no foreign exchange risk for these transactions. The idea that the consumer purchased in a foreign currency in such a transaction is a pure fiction.

41.    For all these reasons, the rates that the Processors impose on cardholders are not representative of the rates the Processors actually pay for foreign currency. Nor are they reflective of any other costs associated with currency conversion that Processors bear. Instead, the Processors and the banks, including Chase, are engaged in arbitrage: they set rates to maximize profits—and do so without regard to the terms of the contracts that they imposed on cardholders.

### B.    Applicable Contractual Provisions

42.    The contractual obligations between Chase and Chase's credit card cardholders— including Plaintiffs and members of the proposed Classes—are set forth in Chase's "Cardholder Agreement." The Cardholder Agreement is provided to credit card applicants who must accept the terms prior to the issuance of any credit card.

43.    The Processors' relationships with Chase are also governed by written agreements. For Visa, these terms are memorialized in the Visa Core Rules and VISA Product and Service

Rules ("the Visa Rules").[5] For Mastercard, these terms are memorialized in the Mastercard Rules.[6] In each of these documents, banks that issue Visa and Mastercard credit cards to their cardholders (including Chase) are referred to as the "Issuers."

### 1. Chase's Agreements with Class Members.

44.    Chase is a member of Visa's network (for its Visa-branded cards) and Mastercard's network (for its Mastercard-branded cards).

45.    Chase maintains a uniform Cardholder Agreement for each Chase-issued credit card product. The terms and conditions set forth in the Cardholder Agreements—including the provisions regarding foreign currency exchange rates—are substantially similar across all of Chase's Cardholder Agreements, including agreements for Visa-branded and Mastercard-branded credit card products. For example, the Cardholder Agreement for the Chase Slate Visa is substantially the same as the Cardholder Agreement for the Chase Southwest Rapid Rewards Plus Credit Card.

46.    At all times relevant to this Complaint, all of Chase's consumer Visa and Mastercard Cardholder Agreements contained substantially similar foreign currency language. Specifically, for all Visa and Mastercard-branded credit cards issued by Chase during the relevant time period, Chase's Cardholder Agreements required the FX rates imposed on Chase's cardholders to be either (1) a wholesale FX market rate, or (2) a government-mandated rate in effect one day prior to the processing date.

---

[5] Visa Core Rules and Visa Product and Service Rules, Oct. 17, 2020, *available at*, https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf (the "Visa Rules").
[6] Mastercard Rules, Dec. 11, 2020, *available at* https://www.mastercard.us/content/dam/mccom/global/ documents/mastercard-rules.pdf (the "Mastercard Rules").

47.    The language used across all these Agreements was identical in relevant part. For example, Chase's 2019 Visa and Mastercard Cardholder Agreements provided:

> If a transaction is in a foreign currency, Visa International or MasterCard International will convert the transaction into U.S. dollars using their own currency conversion procedures, and then will send us the transaction amount. *The exchange rate will be determined using either the range of rates available in the wholesale currency markets for the processing date* (which may be different from the rate the card association receives) *or a government-mandated rate in effect on that date.* The exchange rate used by Visa or MasterCard may differ from the rate on the date of your transaction.

(emphasis added).[7]

48.    Notably, Chase's Deposit Account Agreement—the contract entered into between Chase and its deposit account and debit cardholders—admits that the FX rates applied to FX debit card transactions "will be less favorable than rates quoted online or in publications" and "may include a spread, commissions or other costs that we, our affiliates or vendors charge in providing foreign exchange to you." Specifically, the "Foreign exchange transactions" provision in Chase's February 7, 2021, Deposit Account Agreement provides:[8]

> The exchange rate applied to card transactions that occur in a different currency will be selected by the network that processes the transaction. The network will select from the range of rates available in wholesale currency markets or a rate mandated by the government that issues or controls the currency in that country on the date it processes the transaction. The processing date on which the exchange rate is applied may differ from the date you used your card. When the card transaction is posted to your account, we will charge a Foreign Exchange Rate Adjustment Fee on the card transaction amount after conversion to U.S. dollars. The exchange rate we use may include a spread, commissions or other costs that we, our affiliates or vendors charge in providing foreign exchange to you. The exchange rate may vary among customers depending on your relationship, products with us, or the type of transaction being conducted, the dollar amount, type of

---

[7]    Archived    Chase    Cardholder    Agreements    are    available    at https://www.consumerfinance.gov/credit-cards/agreements/.

[8]    Chase, *Deposit Account Agreement, available at* https://www.chase.com/content/dam/chasecom/en/checking/documents/deposit_account_agreem ent.pdf (last accessed June 30, 2021) (emphasis in original).

currency, and the date and the time of the exchange. You should expect that these rates will be less favorable than rates quoted online or in publications.

(emphasis added).

49.     Although Chase admits that Chase debit card customers are charged FX rates that are less favorable than wholesale market rates, Chase omits that same disclosure language from its credit card Cardholder Agreements.

## 2.     Chase's Agreements with Visa and Mastercard.

50.     Both Visa and Mastercard require issuing banks such as Chase to make specific disclosures to consumers about how FX rates will be determined.

51.     Section 1.4.3.2 of the Visa Rules, as updated on October 17, 2020 and as in effect during the relevant period, provides:

An Issuer must provide a complete written disclosure of any fees that may be charged to a Cardholder for an International Transaction or when Currency Conversion occurs and must include the exchange rate between the Transaction Currency and the Billing Currency as either of the following:

A rate selected by Visa from the range of rates available in wholesale currency markets for the applicable Processing Date, which rate may vary from the rate Visa receives; [or] The rate mandated by a government or governing body in effect for the applicable Processing Date

When Currency Conversion occurs, the Visa rate may be adjusted by the application of an Optional Issuer Fee as determined by the Issuer or via any Issuer self-determined markup outside of VisaNet.

An Issuer may choose the method by which it notifies the Cardholder. This may include one or more of the following, which may include electronic forms of communication:

Original Cardholder application agreement
Terms and conditions
Billing statement
Any other agreement between the Cardholder and the Issuer.

52.    Like the Visa Rules, the Mastercard Rules also indicate issuing banks should inform their cardholders that Mastercard will apply either a wholesale FX market rate or a government-mandated exchange rate to apply to cardholder payment card transactions.

> **Currency Conversion Procedure.** The [Mastercard] Corporation further recommends and encourages Issuers to inform their Cardholders that part of the Corporation's currency conversion procedure includes use of either a government-mandated exchange rate or a wholesale exchange rate, selected by the Corporation, and that the government-mandated exchange rate or wholesale exchange rate that the Corporation uses for a particular Transaction is the rate the Corporation selects for the applicable currency on date that the Transaction is processed (the Central Site Business Date), which may differ from the rate selected on the date the Transaction occurred or on the date the Transaction is posted to the Cardholder's Account.

*See* Mastercard Rules at 125.

53.    Both Visa and Mastercard mitigate foreign exchange risk by purchasing futures, and do not engage in daily trading to ensure their currency needs are satisfied.[9]

54.    Notably, while Chase's Cardholder Agreements indicate that the rates imposed will be either wholesale market rates or government-established rates, Chase's Agreements do not disclose any of the following:

- That the rates will be "selected" by the Processors for the Processors' and the bank's sole benefit;

---

[9] *See* Visa Inc., 2017 Form 10-K, *available at* http://d18rn0p25nwr6d.cloudfront.net/CIK-0001403161/cd6545c2-6c6e-4ba1-8dcd-52cd1521df3a.pdf, at 66 (last accessed June 30, 2021) (noting that Visa uses "currency forward contracts entered into to mitigate a portion of our foreign currency exchange rate risk"); Mastercard Incorporated, 2018 Form 10-K, *available at* http://d18rn0p25nwr6d.cloudfront.net/CIK-0001141391/bb8f61d2-403e-4be9-aee2-70eda24fdce9.pdf (last accessed June 30, 2021) ("**Foreign Exchange Risk Management.** The Company monitors and manages its foreign currency exposures as part of its overall risk management program which focuses on the unpredictability of financial markets and seeks to reduce the potentially adverse effects that the volatility of these markets may have on its operating results. A primary objective of the Company's risk management strategies is to reduce the financial impact that may arise from volatility in foreign currency exchange rates principally through the use of both foreign currency derivative contracts (Derivatives) and foreign currency denominated debt (Net Investment Hedge)").

- That, in many instances, the rate is fictitious in the sense of not being derived from an actual transaction and often being outside the range of prices in the wholesale markets because the transactions are being settled in the consumer's home currency, and that the rate "selected" by the Processors will be different than the rate used to actually settle the transaction;

- That rates will vary depending on the direction of the currency exchange, and will not be selected from bid-ask rates available contemporaneously on the wholesale market, but will instead be selected for the sole purpose of maximizing the bank's and the Processors' profits at the expense of cardholders; and

- That the rates imposed will vary from any actual rates obtained by the Processors and the bank to the extent either engages in wholesale market transactions on the processing date.

## C.    Chase Charged Unlawful Foreign Exchange Rates in Violation of its Contracts

55.    Defendant's exchange rate practices with respect to Visa and Mastercard-branded cards violate Chase's Cardholder Agreements.

56.    Contrary to the requirements set forth in the Chase Cardholder Agreements for Visa-branded credit cards and the Visa Rules, the exchange rates Visa imposed on consumer credit card foreign transactions, which Defendant charged Class Members on those transactions, are not determined "wholesale market" rates. Instead, Visa imposes, and Chase charges, rates that are—for most currencies and on most dates—entirely outside of the range of wholesale market rates in a direction that is disadvantageous for the cardholders and advantageous for Visa and Chase.

57.    A detailed analysis of Visa's historical exchange rates during the relevant period demonstrates that on a majority of days and for a majority of currencies, Visa imposed and Chase

charged exchange rates that fell outside of the daily range of wholesale currency market rates on the applicable processing date.[10]

58.     For example, an analysis of the exchange rates applied by Visa to convert cardholder transactions from Euros to U.S. Dollars demonstrates that the rate imposed on consumers was higher than the range of rates available in the wholesale FX market for the applicable processing date on 94 percent of the dates for the period of September 2018 to August 2019. Visa's rates were within the range of rates available in the wholesale FX market on just 6 percent of those dates.

59.     Discovery will show that Visa's method for determining its rates is largely algorithmic, and that Visa's pattern of generating profits for itself by applying rates that are higher than those promised in cardholder contracts persisted throughout the relevant period, across currency pairs. Each such instance then resulting in Chase charging rates outside the rates it promised its cardholders in Cardholder Agreements injured Plaintiffs and Class Members and imposed an "overcharge."

60.     The extent of the overcharge for each Plaintiff and Class Member Visa card transaction can be calculated using transactional data in the possession, custody, or control of Chase and Visa; historical Visa rates from Visa's website; and historical wholesale FX market data from third-party providers. Any transactions that were not subject to an overcharge—including transactions that took place on the limited number of dates for which Visa applied an exchange rate that was within the range of rates available in wholesale FX market—can be easily identified from those data sets and excluded.

---

[10]     *See* Visa Currency Exchange Calculator, *available at* https://usa.visa.com/support/consumer/travel-support/exchange-rate-calculator.html (*last accessed* June 30, 2021).

61.     Similarly, contrary to the requirements set forth in the Chase Cardholder Agreements for Mastercard-branded credit cards and the Mastercard Rules, the exchange rates Mastercard imposed on credit card foreign transactions, which Chase charged Class Members on those transactions, are not always "wholesale exchange rate[s]." Instead, like Visa, Mastercard frequently imposes, and Chase charges, rates that are—for most currencies and on most dates— outside of the daily range of wholesale rates on the applicable processing date in a direction that is disadvantageous for the cardholders and advantageous for Mastercard and Chase. This practice enables Mastercard and Chase to profit from overcharging cardholders in violation of the Mastercard Rules and the Chase Cardholder Agreements.

62.     An analysis of Mastercard's publicly available historical exchange rates that it has applied to foreign credit card transactions demonstrates that on a large portion of days and for many heavily traded currencies, Mastercard imposed and Chase charged exchange rates that were not in fact wholesale currency market rates.[11]

63.     For example, an analysis of the exchange rates applied by Mastercard to convert Euros to U.S. Dollars ("EUR/USD") to the band of rates available in the wholesale FX market for the corresponding dates for the period of October 2017 to September 2018 shows that the exchange rates Mastercard applied to convert cardholder transactions for EUR/USD were higher than the range of rates available in the wholesale market on 41 percent of the dates for the period of October 2017 to September 2018. Mastercard's rates were at least within the range of rates available in the wholesale FX market on only 59 percent of those dates.

---

[11]   *See* Mastercard Currency Converter, https://www.mastercard.us/en-us/personal/get-support/convert-currency.html (*last accessed* June 30, 2021).

64.     Discovery will show that Mastercard's method for determining its rates is largely algorithmic, and that Mastercard's pattern of generating profits for itself and Chase by applying rates that are higher than those promised in cardholder contracts persisted throughout the relevant period, across currency pairs. Each such instance of Chase charging rates outside the rates it promised its cardholders in the Cardholder Agreements injured Plaintiffs and Class Members and imposed an "overcharge."

65.     The extent of the overcharge for each Plaintiff and Class Member Mastercard transaction can be calculated using transactional data in the possession, custody, or control of Chase and Mastercard; historical Mastercard rates from Mastercard's website; and historical wholesale FX market data from third-party providers such as Bloomberg and Reuters. Any transactions that were not subject to an overcharge—including transactions that took place on the dates for which Mastercard imposed an exchange rate that was a wholesale rate—can be easily identified from those data sets and excluded from Plaintiffs' damages calculations.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs assert their claims on behalf of the following Nationwide Class:

**Nationwide Class:** All persons or entities with a Visa or Mastercard credit card issued by Defendant Chase who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Defendant's executives, executives of Visa and Mastercard, and any Judge and judicial staff assigned to this case.

67.     This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. 23.

68.     Plaintiffs also allege the following alternative statewide subclasses (the "State Classes") in the event that the Court determines that any of the claims alleged on behalf of the proposed Nationwide Class are unsuitable for nationwide class treatment.

69.     Plaintiff Bryan Dahl asserts claims on behalf of the following Illinois Class:

**Illinois Class:** All persons or entities with a Visa or Mastercard credit card residing in Illinois issued by Defendant Chase who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Defendant's executives, executives of Visa and Mastercard, and any Judge and judicial staff assigned to this case.

70.     Plaintiff Rachel Mullins asserts claims on behalf of the following California Class:

**California Class:** All persons or entities with a Visa or Mastercard credit card residing in California issued by Defendant Chase who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Defendant's executives, executives of Visa and Mastercard, and any Judge and judicial staff assigned to this case.

71.     <u>Numerosity</u>: The Classes are so numerous that joinder of all Class members is impracticable. Chase advertises itself as the largest credit card issuer in the U.S., with combined cardholder credit card transaction volume totaling $1.1 trillion per year.[12]

72.     <u>Typicality</u>:  Plaintiffs' claims are typical of the Class Members' claims. Defendant treated Plaintiffs in the same manner as other Class Members and did not vary its FX practices from consumer to consumer.

73.     <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Classes, have no known conflicts with other Class Members, and have retained counsel experienced in complex class action litigation.

74.     <u>Commonality</u>: Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. These common questions include:

---

[12]     Chase, *2019 Annual Report*, available at https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/investor-relations/documents/annualreport-2019.pdf (last accessed June 30, 2021).

a.  Whether Defendant breached its contracts with Plaintiffs and Class Members by charging exchange rates not authorized by the contracts;

b.  Whether Defendant violated covenant of good faith and fair dealing in imposing exchange rates;

c.  Whether Defendant was unjustly enriched by its conduct;

d.  Whether Defendant's practices were deceptive, unconscionable, or unfair; and

e.  The proper measure of damages.

75.  Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

76.  Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices. Members of the Classes do not have an interest in pursuing separate actions against Defendant, as the amount of each Class Member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class Members' claims in a single forum.

77.    The running of any statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and/or omissions of critical information regarding the exchanged rates imposed. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs and Class Members that the exchange rates imposed were not a wholesale market rate and/or a rate reasonably related to Defendant's and the Processors' actual risk of exchanging foreign currencies.  Discovery of Defendant's illegal conduct takes extensive data analysis of foreign exchange data, some of which is not available without paying significant costs.

78.    As a result of Defendant's actions, Plaintiffs and Class Members were unaware, and could not have reasonably known or learned through reasonable diligence, that they had been overcharged as a direct and proximate result of Defendant's and the Processors' acts and omissions.

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF**
### **Breach of Contract**
### **(On Behalf of All Plaintiffs and Proposed Nationwide Class against Chase)**

79.    Plaintiffs incorporate each allegation above as if fully set forth herein.

80.    Plaintiffs and members of the Nationwide Class entered into contracts with Chase that required that the currency conversion rates applied to cardholder foreign currency transactions would be either wholesale FX market rates or a government-mandated rate.

81.    As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates applied by Chase to cardholder foreign currency transactions were not in fact either wholesale FX market rates or a government-mandated rate.

Instead, the rates imposed were higher than those available in wholesale markets on the relevant dates.

82.    In imposing such rates, Chase breached their Cardholder Agreements with Plaintiffs and members of the Nationwide Class.

83.    As a result of Chase's breaches of the Cardholder Agreements, Plaintiffs and members of the Nationwide Class were damaged in the form of overcharges on foreign currency credit card transactions that they otherwise would not have incurred in the absence of Chase's unlawful conduct.

**SECOND CLAIM FOR RELIEF**
**Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of All Plaintiffs and Proposed Nationwide Class against Chase)**

84.    Plaintiffs incorporate each allegation above as if fully set forth herein.

85.    Chase's Cardholder Agreements created the objectively justified expectation that the rates applied for foreign currency exchange would bear some resemblance to rates actually paid by Chase and/or the Processors on the applicable dates.

86.    Chase's Cardholder Agreements created the objectively justified expectation in cardholders that the spread between the rates imposed on foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing Chase's and the Processors' profits, without regard to what normal wholesale market conditions would produce.

87.    In light of its position with respect to consumers and the representations in its Agreements, Chase had an obligation to ensure that the rates paid by its cardholders were imposed in good faith, and that the rates were not imposed for the sole purpose of maximizing Defendant's

and the Processors' profits. This is particularly so where, in many instances, Chase and the Processors were benefitting from the rates without assuming *any* corresponding risk whatsoever because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market.

88.    As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, Chase applied currency conversion rates to cardholder foreign currency transactions in bad faith at the extreme ends of fictional daily bid-ask ranges of wholesale FX market rates such that Plaintiffs and members of the Nationwide Class were injured in the form of overcharges on FX credit card transactions.

89.    Chase's practices described herein breached its duties of good faith and fair dealing in the performance and execution of their contracts with Plaintiffs and members of the Nationwide Class.

90.    As a result of Chase's breaches of its duties of good faith and fair dealing, Plaintiffs and members of the Nationwide Class were damaged in the form of overcharges on foreign currency credit card transactions that they otherwise would not have incurred in the absence of Chase's unlawful conduct.

### THIRD CLAIM FOR RELIEF
### Violations of the Delaware Consumer Fraud Act
### (On Behalf of All Plaintiffs and Proposed Nationwide Class)

91.    Plaintiffs incorporate each allegation above as if fully set forth herein.

92.    Chase's Cardholder Agreements provide that: "This agreement and your account will be governed by federal law, as well as the law of Delaware, and will apply no matter where you live or use this account."

93.     Defendant's conduct alleged herein constitutes "fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise" in violation of 6 Del. C. § 2513. "'Merchandise' means any objects, wares, goods, commodities, intangibles, real estate or services." 6 Del. C. § 2511.

94.     Defendant's conduct here was deceptive and Defendant made false promises and concealed or omitted material facts. Defendant and the Processors imposed FX exchange rates for the sole purpose of maximizing Defendant's and the Processors' profits rather than being authorized by the Cardholder Agreements or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchanges markets. The contractual language dictated by the Processors and used by Defendant did not disclose that Defendant and the Processors would impose rates beyond those allowed by the Agreements.

95.     Defendant's Cardholder Agreements, and the debtor/creditor nature of the relationship also created the objectively justified expectation that the spread between the rates imposed on foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing Chase's and the Processors' profits, without regard to what normal wholesale market conditions would produce.

96.     Further, Defendant and the Processors benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency

that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates applied by Chase to cardholder foreign currency transactions were imposed at the extreme ends of the daily ranges wholesale FX market rates such that Plaintiffs and members of the Nationwide Class were injured in the form of overcharges on FX payment card transactions.

97.    Defendant's practices of applying overcharges to cardholder foreign currency transactions was continuous throughout at least the relevant period.

98.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and members of the Nationwide Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Defendant's unlawful conduct.

99.    As a result of Defendant's violations of the Delaware Consumer Fraud Act, the Nationwide Class seeks all available damages, pursuant to 6 Del. C. § 2525.

**FOURTH CLAIM FOR RELIEF**
**(On Behalf of California Plaintiff and Proposed California Class against Defendant)**
**Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
***Alleged in the Alternative to the Third Claim for Relief***

100.    Plaintiffs incorporate each allegation above as if fully set forth herein.

101.    Defendant has engaged in unfair competition within the meaning of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*., because Defendant's conduct alleged herein is unlawful, unfair, and fraudulent.

102.    California Plaintiff and the members of the California Class are "persons" within the meaning of Section 17201 of the California Unfair Competition Law.

103.    The California Unfair Competition Law prohibits any unlawful and unfair business practices or acts. Defendant's conduct, as alleged herein, constitutes an unlawful and unfair

business practice that occurred in connection with the marketing, advertisement, and sale of its credit card services.

104. **Unlawful prong:** Defendant's conduct, as described herein, violated the Unfair Competition Law's "unlawful" prong because it: (1) violated the unfair trade practices laws of California, and other states; (2) constitutes breach of contract; and (3) constitutes contractual breach of the implied covenant of good faith and fair dealing.

105. **Unfair prong:** Defendant's conduct, as described herein, violated the Unfair Competition Law's "unfair" prong because its conduct violates established public policy intended to regulate credit card services to consumers, and because it is immoral, unethical, oppressive, or unscrupulous and has caused injuries to the California Plaintiff and members of the proposed California Class that outweigh any purported benefit.

106. As a direct and proximate cause of Defendant's conduct, which constitutes unlawful and unfair business practices, as herein alleged, California Plaintiff and members of the California Class have been damaged and suffered ascertainable losses, thereby entitling them to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.

**FIFTH CLAIM FOR RELIEF**
**Violations of the Illinois Consumer Fraud Act**
**(On Behalf of Illinois Plaintiff and Proposed Illinois Class)**
*Alleged in the Alternative to the Third Claim for Relief*

107. Plaintiffs incorporate each allegation above as if fully set forth herein.

108. Defendant's conduct alleged herein constitute "unfair deceptive acts or practices" in violation of Ill. Comp. Stat. § 505/2.

109.    Defendant's conduct here was unfair and deceptive and Defendant made false promises and concealed or omitted material facts. Defendant and the Processors imposed FX exchange rates for the sole purpose of maximizing Defendant's and the Processors' profits rather than being authorized by the Cardholder Agreements or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchanges markets. The contractual language dictated by the Processors and used by Defendant did not disclose that Defendant and the Processors would impose rates beyond those allowed by the Agreements.

110.    Defendant's Cardholder Agreements, and the debtor/creditor nature of the relationship also created the objectively justified expectation that the spread between the rates imposed on foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing Chase's and the Processors' profits, without regard to what normal wholesale market conditions would produce.

111.    Further, Defendant and the Processors benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates applied by Chase to cardholder foreign currency transactions were imposed at the extreme ends of the daily ranges wholesale FX market rates such that Illinois Plaintiff and members of the Illinois Class were injured in the form of overcharges on FX payment card transactions.

112.    Defendant's practices of applying overcharges to cardholder foreign currency transactions was continuous throughout at least the relevant period.

113.    As a direct and proximate result of Defendant's unlawful conduct, Illinois Plaintiff and members of the Illinois Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Defendant's unlawful conduct.

114.    As a result of Defendant's violations of the Illinois Consumer Fraud Act, the Illinois Plaintiff and the Illinois Class seeks all available damages, including punitive damages, and attorneys' fees and costs pursuant to 815 Ill. Comp. Stat. § 505/10a.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, ask for judgment against Defendant as follows:

a.    Certification of this action as a class action on behalf of the proposed Classes;

b.    Designation of Plaintiffs as Class Representatives;

c.    Appointment of undersigned counsel as Class counsel;

d.    Judgment in favor of Plaintiffs on all causes of action;

e.    Declaration that the practices complained of herein are unlawful;

f.    Injunction requiring Defendant to cease and desist from engaging in the unlawful practices alleged herein;

g.    Damages in the form of all money improperly collected or received by Defendant;

h.    Disgorgement of all amounts improperly collected or received by Defendant;

i.    An award of pre-judgment and post-judgment interest as provided by law;

j.    An award of attorneys' fees and costs; and

    k.  Any further remedy the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims so triable.

Date:  July 9, 2021

/s/ *Sharon K. Robertson*

Sharon K. Robertson
COHEN MILSTEIN SELLERS & TOLL
PLLC
88 Pine Street, 14th Floor
New York, NY 10005
T. 212.838.7797
F. 212.838.7745

Eric L. Cramer*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
T. 215.875.3009
F. 215.875.4604
ecramer@bm.net

E. Michelle Drake*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5933
F. 612.584.4470
emdrake@bm.net
**pro hac vice* forthcoming

*Counsel for Plaintiffs and the proposed
Class*